MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2015 ME 98
Docket:       Cum-14-255
Argued:       May 12, 2015
Decided:      July 30, 2015

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

REGIONAL SCHOOL UNIT NO. 5

v.

THE COASTAL EDUCATION ASSOCIATION

ALEXANDER, J.

[¶1]  The Coastal Education Association (the Association), an affiliate of a union representing teachers, appeals from a judgment of the Superior Court (Cumberland County, *Warren, J.*) vacating an arbitration award, which had required Regional School Unit No. 5 (RSU No. 5) to rescind an educational policy requiring that elementary school teachers be present in their classrooms ten minutes before the start of the instructional day.  The court concluded that this dispute was not substantively arbitrable pursuant to the Municipal Public Employees Labor Relations Law (MPELRL), 26 M.R.S. §§ 961-974 (2014), which prevents school boards from bargaining on matters of educational policy or submitting educational policy disputes to interest arbitration, *see id*. § 965(1)(C).

2

[¶2]   The Association argues that the court erred in vacating the award because the record supported the arbitrator's finding that the challenged classroom policy had a greater effect on working conditions than on educational policy, and that the court's decision is contrary to the broad presumption favoring substantive arbitrability.   The trial court was correct in its conclusion that the educational policy requiring teachers to be in their classrooms ten minutes before the start of the instructional day was, as a matter of law, not substantively arbitrable. Accordingly, we affirm the judgment.

## I.  CASE HISTORY

[¶3]   The essential facts are not in dispute.   In 2009, three Maine school districts—Freeport, Pownal, and Durham—merged to form RSU No. 5.   In May 2012, the Association and the Board of Directors of RSU No. 5 (the Board) executed a collective bargaining agreement that would take effect for the 2012-2013 academic year.   Before the agreement was negotiated, Freeport teachers, unlike teachers in Pownal and Durham, were not obligated to arrive at their schools until the very moment that the instructional day began.[1]   The Board became concerned that elementary students in Freeport were congregating outside their classrooms and not entering the classrooms until the start of the instructional

---

[1]   The teachers were and are paid for workdays of seven hours that begin before the six-and-one-half-hour instructional day begins.

day when teachers arrived. Thereafter, students took some time to settle down before the instructional process could actually begin.

[¶4] During negotiations over the collective bargaining agreement, the Board took the position that teachers should be available to meet with parents during the ten-minute period before the start of the school day. The parties agreed to include in article 9(E) of the collective bargaining agreement a requirement (the ten-minute requirement) that "[a]ll educators will be in the building ten (10) minutes before the beginning of their defined instructional day . . . . Educators recognize that they have a responsibility to be in their rooms and ready to start the student day at the beginning of each school day." There was no expectation on the part of the Board that teachers would have an obligation to engage in instructional activities during this ten-minute period.

[¶5] Article 9(B) of the collective bargaining agreement codified an understanding between the parties that several aspects of management of the school day—namely "the length of the instructional day, amount of teaching time, planning and preparation time, and meeting times during the instructional day"— were matters of educational policy and would be subject to the agreement's "meet and consult" and impact bargaining provisions.

[¶6] Pursuant to article 27(A) of the collective bargaining agreement, the Board was given the "legal right to change educational policies during the term of

the agreement," and, if it did so, the Board agreed that it would notify the Association before implementing the change, "so that the Association may . . . invoke its legal right to meet and consult about the change. If the policy is changed, the Board shall, upon request, bargain collectively with the Association regarding the impact of the changes on wages, hours, and working conditions of bargaining unit educators."

[¶7] The "Management Rights" provision of article 4 further provided:

Except as explicitly limited by a specific provision of this Agreement, the Board shall have the exclusive right to take any action it deems appropriate in the management and operation of [RSU No. 5], the implementation of educational policies, and in the direction of the work of the educators in the bargaining unit. Such rights include, but shall not be limited to, the operation of the school district, the right to discharge, to change assignments, to promote, to suspend, to discipline, to establish working schedules, to introduce new or improved methods or facilities, and to contract and subcontract work assignments.

[¶8] The present dispute arose from the district elementary school principal's interpretation of the article 9(E) ten-minute requirement and its impact on the Freeport elementary schools. Prior to the beginning of the 2012-2013 school year, the principal distributed to Freeport elementary school teachers a staff handbook that contained an explanation of the ten-minute requirement. During an in-service meeting, the principal interpreted the requirement to mean that teachers were expected to be in their classrooms, rather than elsewhere in the building, to

meet and greet students during those ten minutes before the start of the instructional day. This interpretation did not extend either the workday or the instructional day, and it did not change the amount of time for which the teachers would be paid.

[¶9] The Association objected to the directive that teachers be in their classrooms to enable students to get settled before the start of the instructional day. Despite that objection, the Association did not request that the Board participate in an impact bargaining process pursuant to article 27(A)(4) of the collective bargaining agreement.

[¶10] In November 2012, however, the Association filed a grievance with RSU No. 5 challenging the principal's interpretation as a violation of article 9(E) of the collective bargaining agreement. The dispute proceeded through the four levels of grievance procedure provided in article 26 of the collective bargaining agreement. The superintendent denied the grievance at the Level II phase, citing article 4 of the collective bargaining agreement as granting the Board the right to direct the work of educators. The Board denied the grievance at Level III, adopting the same reasoning and directing the superintendent "to instruct administration to work to clarify and attempt to find an equitable solution."

[¶11] In April 2013, the Association, as authorized by the collective bargaining agreement, filed a demand for arbitration, arguing that the principal's

interpretation (1) was inconsistent with article 9(E), which it asserted should govern, and (2) had the effect of extending the teachers' instructional day. The Association sought pro-rated per diem pay for affected elementary school teachers as a remedy. RSU No. 5 argued that the ten-minute requirement was a matter of educational policy on which it lacked authority to negotiate pursuant to 26 M.R.S. § 965(1)(C), and thus, that the issue was not substantively arbitrable. RSU No. 5 also argued that articles 4, 9, and 27 authorized it to direct the work of teachers and assign them supervisory duties during the ten-minute period.

[¶12] After a hearing during which the arbitrator heard testimony from Freeport elementary school teachers, the elementary school principal, and the district superintendent, the arbitrator issued a final award in December 2013. In it, the arbitrator concluded that (1) the principal's interpretation of the article 9(E) ten-minute requirement "primarily affects teachers' 'working conditions' and is not primarily a matter of 'educational policy,'" thus making the Association's grievance arbitrable, and (2) the principal's "classroom" directive violated the terms of article 9(E). As a remedy, the arbitrator directed RSU No. 5 to rescind the interpretation of the policy that required teachers to be in their classrooms ten minutes before the start of the instructional day, but concluded that a per diem pay financial remedy was inappropriate without any evidence that the teachers had suffered financial loss.

[¶13]  RSU No. 5 timely filed an application to vacate the arbitration award with the Superior Court pursuant to Maine's Uniform Arbitration Act (UAA), 14 M.R.S. §§ 5927-5949 (2014).  *See id.* § 5938 (outlining the procedure for vacating an arbitration award).  RSU No. 5 argued that the arbitrator exceeded his powers pursuant to 14 M.R.S. § 5938(1)(C) by concluding that the Association's grievance was substantively arbitrable and interpreting the collective bargaining agreement in a manner that undermined the Board's statutory authority to establish educational policy for the best interests of its students.

[¶14]  In May 2014, the court granted RSU No. 5's application to vacate the arbitration award, concluding, as a matter of law, that the principal's interpretation of the ten-minute requirement "falls distinctly into the area of educational policy under prior interpretations of the Law Court and the Maine Labor Relations Board" (MLRB).  Accordingly, the court concluded, RSU No. 5 could not voluntarily arbitrate the issue.[2]  Additionally, the court concluded that the Association had not met its burden to invoke its right to meet and consult over issues of educational policy pursuant to article 27(A)(4) of the collective bargaining agreement,

---

[2]  The court also noted that, given the express language in the agreement defining the instructional day, the principal's "classroom" directive did not have the effect of extending the instructional day.  Because the parties do not appear to dispute this conclusion on appeal, and the Association concedes that the directive does not change the length of the school day, this issue is not addressed further.

8

choosing instead to file a grievance under the contract. The Association filed this timely appeal pursuant to 14 M.R.S. § 5945(1)(E) and M.R. App. P. 2.

## II. LEGAL ANALYSIS

### A. Standard of Review

[¶15] Pursuant to the UAA, a trial court reviewing an arbitration award "reviews both the substantive determination of arbitrability and the power exercised in granting an award." *Granger N., Inc. v. Cianchette*, 572 A.2d 136, 138 (Me. 1990); *see* 14 M.R.S. § 5938(1)(C), (E).[3] A court must vacate an arbitration award if the dispute is not substantively arbitrable; that is, "if the parties did not agree to arbitrate." *V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 2001 ME 73, ¶ 3, 770 A.2d 95; *see also Anderson v. Banks*, 2012 ME 6, ¶¶ 13, 17, 37 A.3d 915. In considering whether the parties agreed to arbitrate a dispute, "[g]eneral rules of contract interpretation apply," and the "contract is to be interpreted to effect the parties' intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished." *V.I.P.*, 2001 ME 73, ¶ 3, 770 A.2d 95.

---

[3] We have differentiated between judicial review of an arbitration award pursuant to 14 M.R.S. § 5938(1)(E) (2014), which "examines the arbitrability of the dispute as a whole," and 14 M.R.S. § 5938(1)(C) (2014), which, in considering whether the arbitrator exceeded his or her power, "examines the way the arbitrator decided the merits of the dispute." *Anderson v. Banks*, 2012 ME 6, ¶ 17, 37 A.3d 915. Although the court in this case did not specify on which basis it was vacating the award, we treat the two subsections together because they "overlap in that, without an agreement to arbitrate a particular dispute, the arbitrator has no power to render an award." *Id.*; *see Westbrook Sch. Comm. v. Westbrook Teachers Ass'n*, 404 A.2d 204, 206-07 n.4 (Me. 1979).

[¶16] Although there may be certain factual considerations involved in an arbitrator's determination of whether parties agreed to arbitrate a given issue, it is ultimately a question of law, and we have held that "[t]he final decision on the question of substantive arbitrability rests with the court." *Roosa v. Tillotson*, 1997 ME 121, ¶ 2, 695 A.2d 1196. Our review of the trial court's decision with respect to arbitrability is de novo, limited to errors of law. *See Granger N.*, 572 A.2d at 138.

B.     Educational Policy vs. Working Conditions

[¶17] The MPELRL imposes upon school boards and teachers' associations the obligation "[t]o confer and negotiate in good faith with respect to wages, hours, working conditions and contract grievance arbitration." 26 M.R.S. § 965(1)(C). This provision "empowers a school committee to enter into binding arbitration agreements in the areas of hours and working conditions and, within those areas, to make adequate provisions for contract grievance arbitration." *Superintending Sch. Comm. v. Portland Teachers' Ass'n*, 338 A.2d 155, 157 (Me. 1975).

[¶18]     By contrast, matters of educational policy are excluded from mandatory bargaining by the provision that "public employers of teachers shall meet and consult *but not negotiate* with respect to educational policies." 26 M.R.S. § 965(1)(C) (emphasis added). This exception "prohibits the school district from negotiating with teachers about educational policy," and accordingly,

"educational policy decisions are not subject to the grievance and arbitration procedure." *Sch. Admin. Dist. No. 58 v. Mount Abram Teachers Ass'n* (*MSAD 58*), 1997 ME 219, ¶ 5, 704 A.2d 349.

[¶19]    We have further held that the mere inclusion of a matter of educational policy in a collective bargaining agreement does not make that educational policy subject to arbitration.[4] *See Bd. of Dirs. of Me. Sch. Admin. Dist. No. 36 v. Me. Sch. Admin. Dist. No. 36 Teachers Ass'n* (*MSAD 36*), 428 A.2d 419, 422 (Me. 1981) (holding that a school board "could not lawfully limit its statutory responsibility for choosing teachers through a collective bargaining agreement, even though entered into voluntarily"). One rationale behind the educational policy exception is that "the [L]egislature deemed 'educational policies' to involve value choices so fundamental that binding decisions concerning them should be made essentially unilaterally and by persons directly responsible to the people." *City of Biddeford v. Biddeford Teachers Ass'n*, 304 A.2d 387, 414 (Me. 1973) (Wernick, J., concurring in part and dissenting in part).

---

[4]  Although some bills have been introduced in the Legislature in recent years that would more clearly open issues of educational policy up to collective bargaining, *see* L.D. 1344, § 1 (121st Legis. 2003) (providing that school boards "may negotiate with respect to educational policies"); L.D. 158, § 1 (122nd Legis. 2005) (providing a clarification that "[p]rovisions in collective bargaining agreements that are later found to control matters of educational policy are neither void nor voidable for that reason but are enforceable only for the term of the agreement"), these proposals have not been enacted.

[¶20] Neither "educational policies" nor "working conditions" is defined by the MPELRL, except that "educational policies may not include wages, hours, working conditions or contract grievance arbitration." 26 M.R.S. § 965(1)(C). The two areas are not compartmentalized; rather, they exist on a continuum and often blend together, and determinations must be made on a case-by-case basis. *See City of Biddeford*, 304 A.2d at 413, 420 (Wernick, J., concurring in part and dissenting in part).

[¶21] A balancing test has been applied to these determinations by the courts and the MLRB. In *MSAD 58*, we held that a district's imposition of a curriculum plan to teach from a book with some sexually explicit content was an educational policy not subject to mandatory bargaining, stating that "[a]lthough the conditions may affect a teacher's preparation of a lesson plan, this incidental effect on teaching techniques does not transform an educational policy into teacher working conditions." 1997 ME 219, ¶¶ 2, 7, 704 A.2d 349.

[¶22] The MLRB has held that supervision of school buildings and playgrounds during recess, lunch periods, and before school is a matter of educational policy not subject to mandatory bargaining. *See Peru Teachers Ass'n v. Peru Sch. Comm.*, No. 78-IR-01 at 1, 3 (Me. Labor Relations Bd. July 10, 1978) (interpretive ruling stating that such supervision involves "a substantial 'managerial' consideration—over and above encroachment upon managerial

supervision, organization, direction and distribution of personnel"); *Ingerson v. Millinocket Sch. Comm.*, No. 77-39 at 4 (Me. Labor Relations Bd. Oct. 14, 1977) ("[P]re-school and noon playground duties relating to the attendance of teachers at school at times when students will be in attendance are matters of educational policy and intended to remain outside the scope of mandatory collective bargaining."). By contrast, the MLRB has held that nonprofessional or purely administrative duties, such as collecting milk and lunch money and distributing lunch to students, are working conditions subject to mandatory bargaining. *See Peru Teachers Ass'n*, No. 78-IR-01 at 1-2 (Me. Labor Relations Bd. July 10, 1978).

[¶23] Appropriate student supervision is necessarily a matter of significant importance to school boards during times when students are present at school. *See id.* at 3. Student supervisory duties affect parent-teacher and student-teacher relations and may assist in improving transitions between periods and promoting student safety. The fact that the ten-minute requirement may touch upon teacher working conditions in some respects does not render it automatically subject to mandatory bargaining. *See MSAD 58*, 1997 ME 219, ¶¶ 5-7, 704 A.2d 349.

[¶24] Our conclusion that the Superior Court correctly determined that the parties did not intend to collectively bargain the requirement that teachers be available to address student and parent needs in classrooms as those students are

arriving at school is bolstered by the language of the collective bargaining agreement. Pursuant to article 9(B), provisions involving teacher "planning and preparation time" and the "amount of teaching time" that takes place are defined as matters of educational policy. Article 4 further provides that the Board has "the exclusive right to take any action it deems appropriate" to manage the work of teachers and establish their work schedules. Article 27(A) vests RSU No. 5 with the authority to adjust such requirements as needed, subject to the meet and consult provisions.

[¶25] Before this dispute arose, article 9(E) already provided that "[a]ll educators will be in the building ten . . . minutes before the beginning of their defined instructional day." RSU No. 5 did not, by voluntarily including this provision in the collective bargaining agreement, relinquish its own authority to adjust this portion of the teacher workday to improve student supervision. *See MSAD 36*, 428 A.2d at 422-23. The elementary school principal's decision interpreting the ten-minute requirement to ensure that teachers are in the classroom during these ten minutes in order to best meet students' needs was an educational policy determination that was within RSU No. 5's discretion.

C.    Conclusion

[¶26] Whether article 9(E) is essentially an educational policy or a policy affecting working conditions is a mixed question of fact and law. There is no

bright line that guides us as to where on the continuum the facts fall. The historical facts relevant to the parties' dispute in this case, however, are undisputed. Accordingly, for the reasons set forth above, we conclude that the ten-minute requirement found in article 9(E) and its subsequent interpretation are predominantly a matter of educational policy and therefore not subject to substantive arbitration.[5] We affirm the trial court's conclusion that the arbitrator exceeded his authority. *See* 14 M.R.S. § 5938(1)(C), (E); *MSAD 58*, 1997 ME 219, ¶¶ 5-7, 704 A.2d 349; *MSAD 36*, 428 A.2d at 422-23.

The entry is:

Judgment affirmed.

**On the briefs:**

Donald F. Fontaine, Esq., Law Offices of Donald F. Fontaine, Portland, and Shawn C. Keenan, Esq., Maine Education Association, Augusta, for appellant The Coastal Education Association

Peter C. Felmly, Esq., and Michael L. Buescher, Esq., Drummond Woodsum, Portland, for appellee Regional School Unit No. 5

---

[5] Because we reach the conclusion that the requirement at issue constitutes educational policy, we do not address additional policy arguments or suggested frameworks for judicial review raised by the Association.

**At oral argument:**

Donald F. Fontaine, Esq., for appellant The Coastal Education Association

Peter C. Felmly, Esq., for appellee Regional School Unit No. 5

Cumberland County Superior Court docket number CV-2014-35
FOR CLERK REFERENCE ONLY